YAMAHA MOTOR CO., LTD.
and Yamaha Motor Corp.,
U.S.A., Plaintiffs,

v.

UNITED STATES, Defendant,

The Torrington Company, Defendant–Intervenor.

Slip Op. 95–185.
Court No. 92–07–00471.

United States Court of
International Trade.

Nov. 20, 1995.

Willkie Farr & Gallagher, Washington, DC (William J. Clinton, James P. Durling, Daniel R. Hunter, Robert H. Edwards, Jr. and Barbara K. Summers) for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Marc E. Montalbine); of counsel: Thomas H. Fine and Stephen J. Claeys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Stewart and Stewart, Washington, DC (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen and Olufemi A. Areola), for defendant-intervenor.

## OPINION

TSOUCALAS, Judge.

At issue in this action are certain aspects of the final determination of the United States Department of Commerce, International Trade Administration ("Commerce"), entitled *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews* ("*Final Results*"), 57 Fed.Reg. 28,360 (1992), concerning imports made from May 1, 1990 through April 30, 1991.

Plaintiffs, Yamaha Motor Co., Ltd. and Yamaha Motor Corp., U.S.A. (collectively "Yamaha"), respectively exported and imported ball bearings, cylindrical roller bearings, spherical plain bearings, and parts thereof ("bearings" or "AFBs") from Japan during the period encompassed by the underlying administrative review. Yamaha alleges that the following errors by Commerce render the Final Results unsupported by substantial evidence and not in accordance with law: (1) disregard of information supplied by plaintiffs and resort to best information available ("BIA") to assess Yamaha's dumping margins, and (2) use of the "all others" rate from the original less than fair value ("LTFV") investigation as BIA. Yamaha moves for judgment on the agency record on these matters pursuant to Rule 56.2 of this Court.

## Background

On May 15, 1989, Commerce published antidumping duty orders on AFBs from various countries, including Japan. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan,* 54 Fed.Reg. 20,904 (1989).[1]

1. *See also Federal Republic of Germany,* 54 Fed. Reg. 20,900 (1989); *France,* 54 Fed.Reg. 20,902 (1989); *Italy,* 54 Fed.Reg. 20,903 (1989); *Romania,* 54 Fed.Reg. 20,906 (1989); *Singapore,* 54

On June 28, July 19 and August 14, 1991, Commerce initiated administrative reviews of those orders with respect to sixty-three manufacturers or exporters, including Yamaha Motor Company for the period May 1, 1990 through April 30, 1991. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews,* 56 Fed. Reg. 29,618 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 33,251 (1991); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 56 Fed.Reg. 40,305 (1991).

On March 31, 1992, Commerce issued its preliminary determinations in the second administrative reviews. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews,* 57 Fed.Reg. 10,868 (1992).[2]

On June 24, 1992, Commerce published one joint final determination for the nine administrative reviews. *See Final Results,* 57 Fed.Reg. at 28,360.

On July 15, 1992, Yamaha commenced this action, challenging the Final Results with respect to Japan.

On October 23, 1992, the Court granted The Torrington Company's ("Torrington") motion to intervene in this action.

On December 14, 1992, Commerce published amended Final Results, correcting certain clerical errors. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Sweden, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews,* 57 Fed. Reg. 59,080 (1992).

## Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

■ Statute provides that the antidumping duty margin equals "the amount by which the foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673 (1988). Although Commerce has discretion to determine the existence and the degree of a margin, it is required to make an "apples-to-apples" comparison between sales in the United States and the home market. *See Torrington Co. v. United States,* 44 F.3d 1572, 1580 (Fed.Cir. 1995). *See also Smith–Corona Group v. United States,* 713 F.2d 1568, 1571–73 (Fed. Cir.1983), *cert denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In accordance with this principle, Commerce "normally will calculate foreign market value and United States price based on sales at the

---

Fed.Reg. 20,907 (1989); *Sweden,* 54 Fed.Reg. 20,907 (1989); *Thailand,* 54 Fed.Reg. 20,909 (1989); *United Kingdom,* 54 Fed.Reg. 20,910 (1989).

**2.** *See also France,* 57 Fed.Reg. 10,859 (1992); *Federal Republic of Germany,* 57 Fed.Reg. 10,862

(1992); *Italy,* 57 Fed.Reg. 10,865 (1992); *Romania,* 57 Fed.Reg. 10,871 (1992); *Singapore,* 57 Fed.Reg. 10,873 (1992); *Sweden,* 57 Fed.Reg. 10,875 (1992); *Thailand,* 57 Fed.Reg. 10,877 (1992); *United Kingdom,* 57 Fed.Reg. 10,878 (1992).

same commercial level of trade." 19 C.F.R. § 353.58 (1992).

Generally, Commerce calculates FMV based on prices to the first unrelated party in the home market. *See, e.g., Nihon Cement Co. v. United States,* 17 CIT 400, 415, 1993 WL 185208 (1993) ("Commerce starts out with the first sale to an unrelated purchaser both in the United States market and in the foreign market"). Regulation provides that Commerce will only use related-party home market sales to compute FMV "if satisfied that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller." 19 C.F.R. § 353.45(a) (1992); *see Sugiyama Chain Co. v. United States,* 18 CIT ——, ——, 852 F.Supp. 1103, 1113 (1994) (court agrees that 19 U.S.C. § 1677b(a)(3) (1988) allows Commerce to use related-party prices which pass a comparability test, but respondent must submit sufficient information for Commerce to conduct such a test). *See also Mitsubishi Heavy Indus., Ltd. v. United States,* 17 CIT 1024, 1028, 833 F.Supp. 919, 923 (1993) (Commerce must ascertain whether sales to related parties are at arm's length). Where arms-length sales are not demonstrated, Commerce "will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade." 19 C.F.R. § 353.58. For example, Commerce is permitted to base FMV upon sales by the related party to the first unrelated party. 19 U.S.C. § 1677b(a)(3) (1988); 19 C.F.R. § 353.45(b) (1992). Finally, where sales from different levels of trade are used to determine FMV and United States price, Commerce will "make appropriate adjustments for the [level-of-trade] differences affecting price comparability." 19 C.F.R. § 353.58. *See also* 19 U.S.C. § 1677b(a)(4)(B).

In addition, 19 U.S.C. § 1677e(c) (1988) authorizes Commerce to rely on BIA "whenever a party ... refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation." Section 1677e(b) requires Commerce to use BIA "[i]f the administering authority is un-

able to verify the accuracy of the information submitted." 19 U.S.C. § 1677e(b). The relevant regulation similarly provides:

The Secretary will use the best information available whenever the Secretary:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1992).

In this second administrative review, Commerce rejected information supplied by Yamaha and applied the "all others" rate from the LTFV investigation as best information available to assess a 45.83 percent dumping margin for Yamaha. *Final Results,* 57 Fed. Reg. at 28,361, 28,379. Commerce stated:

Although Yamaha provided some information, the quantity of this information was not sufficient or adequate to form a basis to calculate foreign market value. Therefore, we have relied exclusively upon BIA to determine Yamaha's dumping margin. Nevertheless, because Yamaha attempted to submit some information, we applied the second tier of BIA.

57 Fed.Reg. at 28,379.

Yamaha essentially presents two challenges to the propriety of Commerce's application of second tier BIA. Yamaha first challenges Commerce's asserted grounds for resorting to BIA. In the alternative, Yamaha contends that even if Commerce was justified in using BIA, it did not use the "best" information that was available on the record.

Commerce resorted to BIA because (a) Yamaha was unable to provide proof of payment for sales to related distributors in the home market; (b) Yamaha misrepresented its home market distribution system and failed to report sales in the home market at the proper level of trade; and (c) Yamaha's questionnaire response presented certain methodological problems. 57 Fed.Reg. at 28,379.

1. *Asserted Grounds for Resort to Best Information Available* [3]

A. *Proof of Payment*

Yamaha first disputes Commerce's claim that it did not prove actual payment for home market sales to related distributors. Yamaha insists that Commerce ignored record evidence of "accounting consolidations" establishing such payment. *Plaintiffs Yamaha Motor Company, Ltd., and Yamaha Motor Corp., U.S.A., Brief in Support of Their Motion for Judgment Upon the Agency Record* ("*Yamaha's Brief*") at 35–37. Yamaha explains that, instead of transacting in cash, its related customers pay through "accounting consolidations." Payment is recorded as the aggregate of revenue received by all of the related companies involved in the transaction. *Yamaha's Brief* at 35. For example, if a related company buys AFBs worth $100 from Yamaha and resells them for $120, the accounting records of the two companies "consolidate" the transaction. Yamaha's $100 receivable is offset by the $120 of revenue earned by the related company. The companies' books register $20 profit for Yamaha and $120 in revenue for the related company. *Id.*

Commerce's Final Results addressed this issue, stating:

> Yamaha admitted that there is no formal "payment" system for home market sales to related customers and that such sales are eliminated upon consolidation. Therefore, the Department could not verify proof of payment. However, the Department is not deciding whether sales to consolidated subsidiaries cannot be used to form the basis of FMV, but rather has decided that in this case, Yamaha's reported transfers to its related subsidiaries cannot be used to form the basis of FMV, absent indication that home market sales were made at the appropriate level of trade. Simply because Yamaha had transfers of subject merchandise to related entities at a particular level of trade that occurred at amounts comparable to sales

to unrelated entities at a particular level of trade does not validate its sales response. *Final Results,* 57 Fed.Reg. at 28,388. *See also* March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1472, 1476, 1486–87.

■ Yamaha has proffered no actual record evidence of payment or pointed to any authority which would convince the Court that Commerce held it to an unreasonable standard. The record is predominated by Commerce's verification report indicating that Yamaha's sales to related companies are inter-corporate transfers for which no proof of payment exists, since these sales are eliminated upon consolidation. *See id.* Therefore, Commerce did not err in finding that Yamaha's reported transfers to related subsidiaries were not validated.

B. *Home Market: Distribution System and Level of Trade*

Commerce argues, *inter alia,* that: (1) Yamaha failed to report a significant portion of its home market distribution system; (2) Yamaha made sales to related home market customers at a different level of trade than its sales to unrelated home market customers and to unrelated customers in the U.S. market; and (3) two of Yamaha's unrelated home market "customers" were actually net suppliers of bearings to Yamaha. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record* ("*Commerce's Brief*)" at 10.

In the Final Results, Commerce also stated:

> The Department believes Yamaha misrepresented its distribution system....
>
> [I]in its Section A response, respondent represented that it had two distribution systems for the home market and distributed AFBs in Japan through a number of related and unrelated distributors. Respondent stated that the only entity in the *U.S.* that imported AFBs subject to the review was YMUS [Yamaha Motor Corp., U.S.A.], a related subsidiary that sold ball

---

**3.** The administrative record is cited as "P.R." and "C.R." referring to the public and confidential records, respectively. "Japan" designates the country specific record; "Gen. Issues" refers to multi-country general issues.

bearings to independent *distributor/dealers.* Later in the proceeding, the Department requested Yamaha to confirm that it had only unrelated *distributor/dealers* as a class of customer in the U.S. market. Yamaha responded that its "only class of customers in the U.S. are unrelated *distributor/dealers.*" December 17, 1991, Supplemental Response at 2 [Japan P.R.Doc. No. 504, Reel 7, Frs. 1668, 1677].... *Together with other information on the record, these representations indicated to the Department that the categories distributor and dealers were synonymous or the same level of trade....* Yamaha represented that its *dealers/distributors ... purchased at the same percentage of price list price in their particular markets, further indicating to the Department that only one level of trade existed in each market.... Until verification, the Department proceeded under the belief that the extent of Yamaha's distribution systems were as depicted in its response.* For the U.S., the distribution chain was depicted as: YMC [Yamaha Motor Company, Ltd.]—YMUS—Independent Distributor/Dealers. For the home market, the distribution chain was depicted as: YMC—Independent and Related Distributors. The Department had no reason to suspect that these were not comparable levels of trade.

*Final Results,* 57 Fed.Reg. at 28,388–89 (emphasis added).

Yamaha counters that it expressly requested that FMV be based on sales prices to two particular home market customers because they are unrelated to Yamaha, are similar to Yamaha's U.S. customers, and Commerce has used prices to these customers in previous related proceedings. Yamaha argues, however, that Commerce apparently misattributed its explanation of direct *unrelated-*party sales to related-party sales. According to Yamaha, Commerce ignored comparable sales to unrelated-parties and concocted deficiencies with Yamaha's related-party sales. *Yamaha's Brief* at 37–40. Yamaha also argues that it informed Commerce that unrelated and related home market customers purchased at a different percentage of list price from its U.S. customers. *Id.* at 41.

Yamaha maintains that all of the purported "misrepresentations" concerning channels of trade also follow from Commerce's inexplicable conclusion that Yamaha was requesting that FMV be based on related-party sales. *Id.* at 39.

While Yamaha had suggested that, for this review, Commerce base FMV on prices to two particular home market unrelated customers, verification revealed that these two "customers" were net suppliers of bearings to Yamaha. *See* March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1486–87. Yamaha's listing of its suppliers did not mention these two parties reported elsewhere as "customers." *See* July 31, 1991 Section A Response, Japan C.R.Doc. No. 15, Reel 12, Frs. 2260, 2270.

Furthermore, even if the prices to these two parties had previously been the basis for FMV, Commerce is not bound by its prior determinations because the identification of customers upon which to base FMV is a factual question to be decided on a case by case basis. *Cf. Citrosuco Paulista v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1087 (1988). This is especially true in the case at bar which concerns previously undisclosed information.

■ Therefore, the Court finds that Commerce reasonably concluded that sales prices to the two unrelated home market "customers" suggested by Yamaha were unusable for FMV purposes.

In addition, in its submission, Yamaha reported two distribution systems for sales in Japan by Yamaha Motor Company, one to independent "distributors" and one to related "distributors." Yamaha also reported sales in the United States by related importer Yamaha Motor Corporation USA to "independent distributor/dealers." July 21, 1991 Section A Response, Japan C.R.Doc. No. 15, Reel 12, Frs. 2260, 2271–72. As the unrelated U.S. distributor/dealers subsequently sold bearings to the ultimate consumers as replacement parts, Commerce reasonably gathered that the local parts centers performed a similar function.

Significantly, however, YMC's Japan distribution system was broader than reported. The related local parts centers *sold parts to independent dealers* who sold the parts to the ultimate consumer. Yamaha failed to report the sales by related parts centers to the independent dealers. *See* March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1476. As these sales were made at a substantially higher percentage of list price, ·they had the potential of affecting Yamaha's dumping margin. *See id.* Commerce did not have the benefit of the information it required to properly calculate FMV. *Cf. Chinsung Indus. Co. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). Thus, Commerce could not base FMV upon the price of sales to the first unrelated party pursuant to 19 U.S.C. § 1677b(a)(3).[4]

In order to identify appropriate home market sales upon which to base FMV pursuant to 19 U.S.C. § 1677b(a)(1) and 19 C.F.R. § 353.45(b), Commerce must be able to identify respondent's customers and the level of trade at which they operate. Level of trade information allows Commerce to match sales by trade level and to make adjustments for differences in levels of trade. Although the record is replete with Yamaha's identification of different levels of trade in the home market and U.S. markets,[5] Yamaha reported *"no variance* in the prices or other terms of sale" between *"retail"* price sales to independent distributors and the related companies. *See* July 21, 1991 Section A Response, Japan C.R.Doc. No. 15, Reel 12, Frs. 2260, 2272, 2274 (emphasis added). However, as sales to the "middle men" local parts centers were not made at the same trade level as sales to unrelated home market "customers," Yamaha's home market customers did not constitute a single class of customers at a single level of trade. More importantly, sales to the local parts centers were not made at the same level of trade as U.S. dealer price sales to distributor/dealers in the U.S. *See* March

17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1476.

As the record supports Commerce's claim that Yamaha did not provide accurate and complete home market sales information for purposes of FMV calculation, the Court also rejects these challenges.

## C. *Methodological Problems*

### (i) *Similar Merchandise*

Statute provides that FMV is the price at which "such or similar merchandise" is sold in the home country. 19 U.S.C. § 1677b(a)(1)(A). Absent sales of identical merchandise in the home and U.S. markets, Commerce is to identify the most similar merchandise for purposes of making a fair value comparison. 19 U.S.C. § 1677(16) (1988). In the underlying proceeding, Commerce identified the "most similar" merchandise as consisting of bearings within the same family.

After identifying all home market models identical to models sold in the United States, Yamaha matched remaining U.S. models without identical matches to the *average list price* of home market bearings which had had identical matches in the United States.

In the Final Results, Commerce determined that "Yamaha had used an incorrect method of reporting its HM [home market] sales." 57 Fed.Reg. at 28,389. Commerce's verification report elaborated:

This methodology does not conform to the Department's requirements for reporting sales and resulted in an underreporting of sales. The Department's questionnaire requires companies to report all identical models and all sales of all home market models in the same family as a model sold in the US. Respondent did not report on its home market sales listing all models in a given family which had members of its family sold in the U.S. during the period of review.

4. The Final Results noted that this was the "comparable level of trade" to U.S. sales. 57 Fed. Reg. at 28,389.

5. *See, e.g.,* July 21, 1991 Section A Response, Japan C.R.Doc. No. 15, Reel 12, Frs. 2260, 2274, demonstrating that the percentages in the home and U.S. markets differed and that they were different percentages of different price levels.

March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1478.

Yamaha argues that Commerce's "price list option" permitted the reporting of list prices rather than individual transaction prices.[6] *Yamaha's Brief* at 28. Yamaha also argues that it under-reported home market sales because it misunderstood the questionnaire but its interpretation was reasonable. *Id.* at 27–28. According to Yamaha, the following text was ambiguous:

> Report home market (or third country, if appropriate) *sales data* only for those products which were identical to products sold to the United States. (See "Identical Merchandise" in the Glossary.) If you sold bearings to the United States for which there were no identical bearings sold or offered for sale in the home market (or TC market) at the time of the U.S. sale(s), report HM (or TC) *data* for all models in the same family as the model sold to the United States.

*Id.* at 29 (quoting August 16, 1991 Sections B and C, Antidumping Questionnaire, Gen.Issues P.R.Doc. No. 27, Reel 1, Frs. 1798, 1806 (emphasis added)). Yamaha maintains that it interpreted the first sentence of the above text as establishing a universe of model comparisons which included only home market models identical to U.S. models and it assumed that list prices for U.S. models would be compared to average list prices of home market models that had been reported previously. *Id.* at 29, 31. Yamaha maintains that it interpreted the second sentence as requiring it to report, not sales or price data, but cost data for the difference-in-merchandise adjustment. *Id.* at 30–33. Yamaha also argues that Commerce's complaints are merely methodological disputes, not factual errors of any consequence as only a small percentage of total U.S. sales were affected. *Id.* at 33–34. Yamaha submits that Commerce could have extracted all of the required sales quantities from the Section A Response. *Id.*

It is Commerce's position that Yamaha's methodology did not meet the "similar mer-

chandise" matching requirements of 19 U.S.C. § 1677(16). *Commerce's Brief* at 20. Commerce argues that Yamaha's methodology matched certain U.S. models to an average of the list price of bearings with which, potentially, there was little or nothing in common. *Id.*

In rebuttal, Yamaha maintains that it compared the U.S. models without identical home market matches to the average of identical home market models in the *same family* as the U.S. model. *Reply Brief of Yamaha Motor Company, Ltd., and Yamaha Motor Corp., U.S.A.* ("*Yamaha's Reply*") at 2–24 (emphasis added).

Commerce also states that difference-in-merchandise data is only requested in Part V, paragraph 72 of the questionnaire and not in the "price list option" section. *Commerce's Brief* at 21–22.

■ The Court has reviewed the record and concludes that Commerce's instructions were clear as to what home market bearings should be reported for U.S. bearings without identical matches. If the instructions were confusing, Yamaha should have sought clarification from Commerce.

Further, Yamaha's argument that it misunderstood the "price list option" is also without merit. Pursuant to the price list option, although respondents were not required to list individual sales, they were requested to "report the total quantity of *each product* sold at the stated list price and with the same discounts and rebates." *See, e.g.,* August 16, 1991 Questionnaire, Gen.Issues P.R.Doc. No. 27, Reel 1, Frs. 1798, 1806 (emphasis added). The fact that Yamaha was permitted to report its sales collectively according to a price list has nothing to do with which home market models Yamaha was required to report.

In addition, it is inconceivable how Yamaha could have believed Commerce was seeking difference-in-merchandise data as nothing in the "price list option" section contained in

6. In this review, as a simplification procedure, Commerce permitted respondents who could certify that they sold the subject merchandise according to published price lists, to submit sales data in consolidated form. Individual sales were not required to be reported and prices offered in authentic published price lists could be used as the basis for foreign market value. March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1473.

Part III of the questionnaire discusses difference-in-merchandise data. *See id.* at Frs. 1805–07.

Although Yamaha compared U.S. models without home market identical matches to the average of identical home market models in the same family,[7] Commerce's questionnaire requested sales data for *all models* in the same bearings family as the U.S. model without identical model matches. Instead of reporting such information, Yamaha matched remaining unmatched U.S. sales to an "average" of the home market identical sales already identified. Therefore, Commerce properly concluded that Yamaha's reporting of model matches was inconsistent with the requirements of 19 U.S.C. §§ 1677b and 1677(16). As Yamaha's use of a methodology for comparing unmatched U.S. sales to an average of home market sales having identical matches was insupportable, Yamaha's argument on this point is unavailing.

### (ii) *Home Market Selling Expenses*

Under the "price list" abbreviated questionnaire response option, Yamaha was permitted to report aggregated expenses for this review.

Commerce contends that Yamaha overstated its home market expenses by calculating them as if all of its sales had been made at full list price, although they were made at discounted prices. *Commerce's Brief* at 23–26; *Final Results,* 57 Fed.Reg. at 28,389. Commerce explains, "Yamaha calculated its expense adjustment by dividing the total amount of each particular type of expense by the total value of home market sales. The resulting ratio was multiplied by the full list price for each unit to obtain the per-unit expense, even though the merchandise was actually sold at a deep discount." *Commerce's Brief* at 25 (citing March 17, 1991 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1472). Consequently, claims Commerce, Yamaha decreased FMV, artificially reduced its dumping margin and "significantly impeded" the review. *Commerce's Brief* at 24.

As justification for overstating home market expenses, Yamaha contends that Com-

merce's "price list option" required an abbreviated price list, not a full sales list response. In addition, Yamaha contends that Commerce should have known about this methodological problem prior to verification and could have corrected it with "a few lines of computer code." *Yamaha's Reply* at 2–3.

 It is the respondent's obligation to supply Commerce with accurate information. *Chinsung Indus.,* 13 CIT at 106, 705 F.Supp. at 601. While Commerce may have had the information to recalculate Yamaha's selling expenses to correct the overstatement, the court has stated that respondents "must submit accurate data" and "cannot expect Commerce, with its limited resources to serve as a surrogate to guarantee the correctness of submissions." *Murata Mfg. Co. v. United States,* 17 CIT 259, 265, 820 F.Supp. 603, 607 (1993) (citation omitted). In general, Commerce is not required to correct a respondent's errors when erroneous data is reported and not timely corrected. *See NSK Ltd. v. United States,* 16 CIT 745, 749, 798 F.Supp. 721, 725 (1992), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993). Accordingly, the Court rejects Yamaha's challenge.

In sum, the Court finds that Commerce properly resorted to BIA to assess Yamaha's dumping margins. *See National Steel Corp. v. United States,* 18 CIT ——, ——, 870 F.Supp. 1130, 1134 (1994) (approving Commerce's resort to BIA where the foreign respondent omitted significant information from submissions). *See also Tatung Co. v. United States,* 18 CIT ——, ——, Slip Op. 94–195 at 9–14, 1994 WL 704952 (Dec. 14, 1994) (upholding Commerce's resort to BIA for omissions and errors).

### 2. *Selection of BIA*

 Once Commerce determines that BIA is necessary pursuant to 19 U.S.C. § 1677e(c), it applies a two-tier BIA method. Under the two-tier method, Commerce divides respondents into two categories: those that were uncooperative and significantly impeded the investigation and those that substantially cooperated. Uncooperative respondents receive the higher of the highest

---

**7.** *See* March 17, 1992 Verification Report, Japan C.R.Doc. No. 233, Reel 19, Frs. 1471, 1478.

rate assigned for any firm in the LTFV investigation or prior administrative reviews or the highest rate calculated in the same administrative review. *See Final Results,* 57 Fed.Reg. at 28,379; *see also Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 722, 130 L.Ed.2d 628 (1995).

Yamaha contends that it cooperated fully with Commerce and submitted complete data sufficient to cover every element necessary for Commerce's dumping margin determination. Yamaha challenges Commerce's rejection of its submission and its application of the "all others" rate from the LTFV investigation as BIA. *Yamaha's Brief* at 44–66.

■ Yamaha's argument on this issue is without merit. The underlying purpose of the BIA rules provided in 19 U.S.C. § 1677e is "to facilitate the determination of dumping margins as accurately as possible within the confines of extremely short statutory deadlines." *Allied–Signal,* 996 F.2d at 1191. Congress has bestowed broad discretion upon Commerce to determine what constitutes best information available. *See id.* at 1191; *Rhone Poulenc, Inc. v. United States,* 13 CIT 218, 710 F.Supp. 341 (1989), *aff'd,* 899 F.2d 1185 (Fed.Cir.1990). It is for Commerce, not respondent, to determine what is the best information. *See id.* at 224, 710 F.Supp. at 346. In addition, "the best information rule is designed to prevent a respondent from controlling the results of an administrative review by providing partial information or by delaying or hindering the review." *Id.* at 225, 710 F.Supp. at 347.

The Court finds that the record as a whole supports Commerce's determination that the multiple and pervasive nature of Yamaha's errors and omissions prevented reliance on Yamaha's response for the Final Results. Particularly, Yamaha failed to provide Commerce with accurate and complete information concerning its home market distribution system and the identity of its customers. It reported model matches incorrectly, exaggerated its home market expenses, and failed to adequately prove payment from related distributors. Therefore, Commerce properly exercised its discretion by applying second-tier BIA and using the LTFV "all others"

rate as BIA to calculate Yamaha's dumping margin. The Court sustains Commerce's decision as reasonable, supported by the administrative record and in accordance with law. *See Emerson Power Transmission Corp. v. United States,* 19 CIT ——, 903 F.Supp. 48 (1995). *See also Tatung Co.,* 18 CIT at ——, Slip Op. 94–195 at 9–14, 1994 WL 704952 (upholding total use of BIA for omissions and errors); *Rhone Poulenc,* 13 CIT at 218, 710 F.Supp. at 341 (where errors and omissions are cumulative and widespread, Commerce may reject the submitted information *in toto* ).

## Conclusion

The Court holds that Commerce properly rejected data submitted by Yamaha in favor of the "all others" rate from the original LTFV investigation to calculate the antidumping duty margins applicable to Yamaha for this review. As Commerce's determination is supported by substantial evidence on the record and is in accordance with law, Yamaha's motion for judgment on the agency record is denied and this action is dismissed.