Slip Op. 00 - 63

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - -x
BETHLEHEM STEEL CORPORATION, INLAND
STEEL COMPANY, INC., and U.S. STEEL  :
GROUP  A UNIT OF USX CORPORATION,
                                     :
                      Plaintiffs,
                                     :
           v.
                                     :
UNITED STATES,                           Court No. 96-05-01313
                                     :
                      Defendant,
                                     :
           -and-
                                     :
ALGOMA STEEL INC., GERDAU MRM STEEL
and STELCO, INC.,                    :

           Intervenor-Defendants.:
- - - - - - - - - - - - - - - - - - - -x

<u>Memorandum & Order</u>

[Plaintiffs' motion for judgment on agency
 record granted in part and denied in part;
 remanded to International Trade Administration.]

                              Decided:  June 2, 2000


     Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Light-
hizer, John J. Mangan, Ellen J. Schneider and James C. Hecht)  for
the plaintiffs.

     David W. Ogden, Acting Assistant Attorney General; David M.
Cohen, Director, and Velta A. Melnbrencis, Assistant Director,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice; and Office of Chief Counsel for Import Administration, U.S.
Department of Commerce (Linda A. Andros and Jeffrey C. Lowe), of
counsel, for the defendant.

     Hogan & Hartson L.L.P. (Mark S. McConnell, Richard L. A. Weiner
and Roger P. Alford) for intervenor-defendant Algoma Steel  Inc.

     Ross & Hardies (Peter A. Martin) for intervenor-defendant
Gerdau MRM Steel.

   Willkie Farr & Gallagher (Christopher A. Dunn, Daniel L. Por-ter
and Jacqueline A. Weisman) for intervenor-defendant Stelco, Inc.

AQUILINO, Judge:  Pursuant to CIT Rule 56.2, the plain-tiffs have interposed a motion for judgment upon the record com-piled by the International Trade Administration, U.S. Department of Com-merce ("ITA") sub nom. Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada; Final Results of Antidumping Duty Administrative  Reviews, 61 Fed.Reg. 13,815 (March 28, 1996). Those Final Results include margins of dumping both kinds of steel by Stelco, Inc.  of 0.19 and 0.92 percent, respectively, as well as 1.82 and 0.02 percent for cut-to-length plate from Algoma Steel Inc. and Mani-toba Rolling Mills, respectively.[1]  The plaintiffs, the petition of which led to the underlying antidumping-duty order, contest the Results with regard to the cut-to-length steel plate[2] on the specified grounds that the ITA erred in (a) accepting after veri- fication an unverified change in the unit value of Algoma scrap; (b) accepting costs reported for less than all of that company's facilities which produced the steel under review; (c) accepting incorrect price adjustments for Stelco

_____

[1] See 61 Fed.Reg. at 13,833.  Each of these companies has intervened herein as a party defendant, the last sub nom. Gerdau MRM Steel, which will be referred to hereinafter by the acronym in the record, MRM.

[2] Issues focusing on the corrosion-resistant carbon steel flat products are discussed sub nom. AK Steel Corp. v. United States, 21 CIT 1204 (1997), remand results aff'd, 22 CIT ___, Slip Op. 98-106 (July 23, 1998).

products; (d) accepting    unsupported MRM rebates; (e) accepting

partial-year information

as to MRM general-and-administrative expenses in calculating cost of production and constructing value; (f) accepting unsupported claimed credit expenses for that company; and (g) relying on a ministerial error in calculating margin(s) for Algoma.

The defendant responds that this case should be remanded to the ITA to

> (1) correct a ministerial error in Commerce's model match program for Algoma Steel . . . and (2) to re-consider the adjustment made for the credit expenses for . . . MRM[]. Plaintiffs' motion, however, should be denied in all other respects . . ..

Defendant's Memorandum, p. 1.  Counsel for the first-named inter-v-enor do

> not oppose a remand by this Court to the Department  for the sole and limited purpose of correcting the ministerial error with instructions for the Depart- ment to take full account of the accuracy of corrections to the computer programming code.

Brief of Algoma Steel Inc., pp. 30-31.  On its part, MRM takes the position that none of plaintiffs' points, including that with regard to its credit expenses, merits any judicial relief. Stelco, Inc. also argues that the agency's _Final Results_ should be affirmed in their entirety.

I

Jurisdiction to decide plaintiffs' motion is pursuant to 28 U.S.C. §1581(c).  And the standard for review of the con-tested ITA determination is whether it is unsupported by substantial evidence on the record or otherwise not in accordance with law.[3]

A

For the merchandise at issue, the record reflects three stages of production at Algoma Steel, denominated as slab, roll-ing, shearing, during each of which scrap resulted.  The company determined the amount and cost thereof at each stage and reported it as a cost of production and also, because the scrap was either sold or remelted, reported a scrap-revenue amount.

During the process of ITA verification of the data provided, Algoma notified the agency that it had discovered a "minor" clerical error in the calculation of yield loss[4] at one of its shearing lines, and it submitted a "corrections memorandum", which the ITA determined to accept.  See 61 Fed.Reg. at  13,818.  The

---

[3] 19 U.S.C. §1516a(b)(1)(B) (1994).  As noted in AK Steel Corp. v. United States, supra, amendments to this governing Title 19, U.S.C. effectuated by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), do not apply to adminis-trative reviews commenced before January 1, 1995, which is the case here. See 21 CIT at 1205 n. 1, citing Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed.Cir. 1995).

[4] See Record Document ("R.Doc") 421, p. 1.  See also Confi-dential Record Document ("ConfDoc") 204, first page.

agency did so, having verified the existence of the error and also having recognized that, as a result of its cor-rection, not only the yield-loss factor changed, scrap revenue did as well.  See id.; Brief for Algoma Steel Inc., Exhibit 1.

The plaintiffs point out that this revision was produced several months after the deadline for submission of fact- ual information specified in 19 C.F.R. §353.31(a)(1)(ii) (1994).   The ITA concluded, however, that the submission was based upon the error detected during verification and that the correction  in scrap revenue was not new information received in contravention of the foregoing regulation.  See 61 Fed.Reg. at 13,818.  The court concurs; that is, its receipt was in accordance with law.

As for plaintiffs' position that the correction is not supported by substantial evidence, the record shows the yield-loss percentage at the shearing stage to be a known figure, as are the numbers for the volume and the value of Algoma's production of sheared steel plate.  Dividing that volume by that per-centage gives a figure for the volume of steel entering that stage.  That is, that resultant number was derived; it was not otherwise determined in the regular course of Algoma's process  of manufacture.  Hence, when the percentage for yield loss was found during agency verification to be too high, its downward adjustment necessarily increased the figure

for the volume of unshorn plate and thus also for the cost thereof. Since the volume and value of the finished product were known and veri-fied, the net effect of the yield-loss percentage correction was to increase the scrap-revenue number.

The plaintiffs complain that, "if only the total ton-nage of scrap changes (and not the unit value of scrap) then, as a matter of simple arithmetic, the rate of change of total scrap revenue should be identical" to the rate of change in total ton-age of scrap. Plaintiffs' Brief, p. 15, n. 25.  However, the cor- rected yield-loss percentage changed both total tonnage of scrap *and* its unit value. When the yield-loss percentage decreased, the total amount of steel entering the shearing stage and total costs at that stage increased. Therefore, the scrap-revenue amount had to increase by the same amount as the cost of the ad- ditional steel.  The unit value of scrap is derived by dividing  the scrap-revenue amount by the total volume of sheared plate.  Since that volume of sheared plate was fixed, the unit value of scrap also had to increase.  In sum, the record evidence supports the ITA's acceptance of Algoma's correction.

B

The plaintiffs allege that the ITA erred in accepting Algoma's costs as reported.  That is, the company produced sub-ject merchandise on two mills, a 166-inch plate mill and a 106-inch strip

mill, but the former rolled a greater percentage of cut-to-length steel plate than the strip mill. Algoma calculated cost of production on a process basis in which the monthly opera- tional costs were recorded for each mill without allocation to specific products.  See R.Doc 306, p. 17.

During its administrative review, the ITA requested that Algoma allocate costs on the basis of the different widths and gauges of steel.  In doing so, the company

> started with total rolling costs for each mill for each time period.  Dividing that number by the tons produced by the mill during the period yielded average rolling costs per ton.  Algoma then attributed rolling costs to individual widths and gauges based on the average cost, adjusted to reflect mill productivity in producing dif- ferent widths and gauges.

Brief of Algoma Steel Inc., p. 16.  The plaintiffs do not object to this particular methodology, rather to Algoma's reliance on plate- mill costs for those of the strip mill.  As explained by the company, the

> Strip Mill produces non-subject merchandise almost exclusively . . ..  The only Strip Mill cost recorded in Algoma's records, however, is overall cost of Strip Mill operations for a time period, which is determined almost entirely . . . by the cost of rolling merchandise that is *not* subject to the investigation.  There exists no separate record for the cost of rolling sub-ject merchandise on the Strip Mill -- there simply are no "actual" costs for rolling of plate on the Strip Mill. Instead, this number had to be developed by allocation. Algoma had two options in this respect: either Algoma could assign a cost that is drawn from Strip Mill

>     experience, but reflects almost entirely non-subject
>     merchandise, or Algoma could assign a cost that reflects
>     the cost of subject merchandise as it is rolled on the
>     Plate Mill, assigning that cost to all plate irrespective
>     of whether the plate was produced  on the Plate Mill or
>     the Strip Mill.

Id. at 16-17 (emphasis in original).  Nonetheless, the plaintiffs

contend that, since the company was able to report actual costs, the

ITA should be required to apply to the strip mill the best

information otherwise available or "BIA", which was defined at the

time to include the factual information submitted in support of the

petition.  19 C.F.R. § 353.37(b) (1994).

        Certainly, the ITA has a duty to make determinations  as

accurately as possible.  E.g., NTN Bearing Corp. v. United States, 74

F.3d 1204, 1208 (Fed.Cir. 1995); Rhone Poulenc, Inc. v. United

States, 899 F.2d 1185, 1191 (Fed.Cir. 1990).  And parties should

provide the information requested in an accurate and timely manner.

See, e.g., Societe Nouvelle de Roulements v. United States, 19 CIT

1362, 1368, 910 F.Supp. 689, 694 (1995); Yamaha Motor Co. v. United

States, 19 CIT 1349, 1359, 910 F.Supp. 679, 687 (1995).  Indeed,

failure to do so resulted in resort to best information otherwise

available per 19 U.S.C. §1677e and 19 C.F.R. §353.37 (1994).  E.g.,

Union Camp Corp. v. United States, 20 CIT 931, 938-39, 941 F.Supp.

108, 115 (1996), and cases cited therein.  Moreover, the agency, not

a party under review, is responsible for deciding what information is needed.  See, e.g., Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1572 (Fed.Cir. 1990); Comitex Knitters, Ltd. v. United States, 16 CIT 817, 821, 803 F.Supp. 410, 414 (1992).

Historically, "Congress has granted Commerce consider-able latitude in determining cost of production."[5]  There was no requirement that actual costs be used or that a particular meth-odology be followed.  Rather, the agency had discretion to choose between "reasonable alternatives".  Technoimportexport, UCF Amer-ica Inc. v. United States, 16 CIT 13, 18, 783 F.Supp. 1401, 1406 (1992).

Here, finding that Algoma was unable to provide pro-duct-specific costs but that a "relatively accurate calculation" was presented, the ITA verified the "soundness and reasonableness" of that methodology.  Defendant's Memorandum, p. 21, cit-ing Floral Trade Council v. United States, 17 CIT 392, 399, 822 F.Supp. 766, 772 (1993).  The plaintiffs claim that, because actual cost data were available, yet unreported, the ITA had to rely on BIA, which the agency was directed to use whenever it  was "unable to verify the accuracy of information submitted" or "whenever a party . . . [wa]s unable to produce information re-quested in a timely manner and in

---

[5] Timken Co. v. United States, 18 CIT 486, 494, 852 F.Supp. 1122, 1129 (1994).  But see Uruguay Round Agreements Act, Pub.L. No. 103-465, §224, 108 Stat. 4809, 4882 (1994).

the form required, or other- wise significantly impede[d] an invest-igation."  19 U.S.C. §  1677e(b) & (c) (1994).  In doing so, the agency could consider the "degree of cooperation by the respondent . . . in reaching its decision either to apply BIA or accept the available infor-mation."  AK Steel Corp. v. United States, 21 CIT 1204, 1223 (1997), remand results aff'd, 22 CIT ___, Slip Op. 98-106 (1998).  Given this standard, this court cannot conclude that the ITA was required to rely on BIA for Algoma.

The plaintiffs argue that the company's methodology skewes the difference-in-merchandise ("difmer") adjustment and  20-percent test for product comparability.[6]  Foreign-market value could be adjusted for differences in price attributable to dif-ferences in

---

[6] The petitioners stated in their brief before the agency in regard to Algoma:

> In the instances where the U.S. sales are match- ed to non-identical home market products, there is no way to ensure that the U.S. total cost of manufacture is accurate, and therefore there is no way to determine whether the 20 percent test (to show comparability) has been properly performed.  Moreover, there is no way to determine that the U.S. variable costs, which are used to calculate the difmer and, in turn, the margins for such sales, are accurate.  Accordingly, BIA must be used for all such sales as well.

R.Doc 473, p. 14.  Despite defendant's argument, the ITA did have  an opportunity to consider this matter, and it is therefore now properly before the court.

physical characteristics of the goods. <u>See</u> 19 U.S.C. §1677(16)(B) &

(C); §1677b(a)(4)(C) (1994).  The ITA was author-ized to

> make a reasonable allowance for differences in the
> physical characteristics of merchandise compared to  the
> extent that [it] is satisfied that the amount     of any
> price differential is wholly or partly due     to such
> difference.

19 C.F.R. §353.57(a) (1994).  Furthermore, in determining whether an

allowance is reasonable, the agency "normally will consider

differences in the cost of production but, where appropriate, may

also consider differences in the market value."  <u>Id</u>., §353.57(b).

The 20-percent test is set forth in Import Administra-tion

Policy Bulletin 92.2 (July 29, 1992), wherein the ITA re-ports that,

when "the variable cost difference exceeds 20%, we consider . . . the

probable differences in values of the items  to be compared [] so

large that they cannot be reasonably compared." <u>See</u>, <u>e</u>.<u>g</u>., <u>SKF USA

Inc. v. United States</u>, 19 CIT 54, 57, 874 F.Supp. 1395, 1399 (1995)

(this approach sustained on the ground that "there is a statutory

preference for comparison of most similar, if not identical,

merchandise").

Whenever actual costs are not available and the ITA

relies on a respondent's other, existing data to ascertain the cost

of production, a petitioner may argue that they distort the difmer.

But the law does not require reliance on actual costs, and the record indicates that the ITA made a reasonably accurate assessment of the costs in this case, thereby minimizing any arguable distortion.

The court is urged, "at the very least, [to] require the Department to apply partial BIA in the comparison of non-identical merchandise where at least one product was produced   on the strip mill or on both mills."  Plaintiffs' Brief, p.    34.  In support of this plea, the plaintiffs cite <u>Cemex, S.A.   v. United States</u>, 20 CIT 993 (1996), and <u>Timken Co. v. United States</u>, 18 CIT 897, 865 F.Supp. 850 (1994).  In those two cases, however, the court upheld resort to best information otherwise available where the ITA had repeatedly requested information which the respondents failed to provide.  Here, the record re-flects Algoma Steel provided requested information, and the agency's decision not to resort to BIA was in accordance with law.

C

Intervenor-defendant Stelco, Inc. claimed an adjustment to foreign-market value for billing errors corrected by debit and credit notes. See 61 Fed.Reg. at 13,831. The plaintiffs allege that the ITA erred in accepting the adjustment. The defendant agrees that price adjustments made for billing errors must be transaction-specific but states that the company did allocate the debit and credit notes on a transaction-specific basis. See id.

Adjustments to the price of a product in response to billing errors for a particular customer constitute direct sell-ing expenses. Torrington Co. v. United States, 82 F.3d 1039, 1050 (Fed.Cir. 1996). In order to receive an adjustment for direct selling expenses, they must be tied to specific trans-actions.[7] Stelco's method "matched each credit and debit note  to the specific invoice or invoices to which the note applied  so that the

---

[7] Cf. NSK Ltd. v. United States, 190 F.3d 1321, 1328-29 (Fed.Cir. 1999) (adjustment for direct selling expenses denied because not reported on a transaction-specific basis); AK Steel Corp. v. United States, 21 CIT at 1224:

> The adjustments at issue are not for widely avail-
> able discounts, rebates or similar items which may or may
> not be determinable on a fixed or constant basis across
> numerous sales. Rather they are for generally variable
> adjustments for clerical or other billing err- ors. Such
> adjustments must be related on the record  to specific
> transactions, either directly or through proper
> allocation.

adjustments were transaction-specific".  Defendant's Memorandum, p.

30. See also 61 Fed.Reg. at 13,831.  The defend-ant notes that,

> when the adjustment is made with reference to a specific
> invoice or invoices that cover the merchandise under
> investigation, it is clear that the adjustment  is
> transaction-specific, even if it is allocated.[8]

The "danger of allocation . . . is the averaging effect on prices."

61 Fed.Reg. at 13,831.  Where, as here, price adjustments are tied to

specific invoices, allocations are essentially transaction-specific,

and that danger is diminished.

_____

[8] Defendant's Memorandum, p. 31.  The ITA's Final Results herein
state that

> Stelco reported the majority of these expenses on      a
> transaction-specific basis.  However, on occasion, Stelco
> allocated debit and credit notes for a par-ticular
> customer over more than one invoice.  While  the
> Department prefers that discounts, rebates and other price
> adjustments be reported on a transac-  tion-specific
> basis, the Department has long recog-nized that some price
> adjustments are not granted on that basis, and thus cannot
> be reported on that basis.

61 Fed.Reg. at 13,831.  In AK Steel Corp. v. United States,    supra,
the court recognized that, "[w]hen dealing with limited adjustments
applicable to a very few invoices[,] the distinction between
'directly transaction specific' and 'properly allocated' seems to
blur", and upheld the allowance of properly allocated adjustments.
21 CIT at 1226.  The court reported that the ad-justments therein "do
appear to be proper allocations." Id.  In this case, while the ITA
does appear to be confused as to wheth-er or not Stelco's adjustments
are transaction-specific, it at least takes the position that the
adjustments are properly allo-cated.  See 61 Fed.Reg. at 13,831-32.

Plaintiffs' position is also based on the discovery during agency verification of an improper allocation to several sales of a particular adjustment that actually pertained to just one.  See Plaintiffs' Brief, pp. 42-43.  They claim that "this distortion did not represent an isolated error in Stelco's re-porting; rather it reflected Stelco's methodology for allocating price adjustments." Id. at 44-45 (emphasis in original).  Both  the defendant and the company claim it was indeed an "isolated instance" of incorrect reporting, "resulting in a minor and    limited . . .  error" that was "nothing more than a[] clerical oversight on the part of a Stelco employee."[9]  Given the small number of verified sales with debit or credit notes, however, this court is unable to determine on the record presented wheth-er the agency's adjustment is supported by substantial evidence.

D

---

[9] Defendant's Memorandum, pp. 34-35.  See also Stelco's Brief, pp. 11-13.  The company adds that it was "the very un-usual circumstance that a single correcting credit note was    issued for two billing errors that was the cause of the cross-referencing error." Stelco's Brief, p. 13.  But the court fails to discern evidence on the record that the company ordinarily issued a credit note for each billing error.

The ITA granted MRM a circumstances-of-sale adjustment to foreign-market value for rebates given to customers on subject merchandise.  <u>See</u> 61 Fed.Reg. at 13,828.  Such adjustments are

> generally allow[ed] . . . for discounts and rebates where respondents have granted and paid them on sales of subject merchandise to unrelated parties during the period of review.  Such discounts or rebates should be part of a respondent's standard business practice and not intended to avoid potential antidumping duty liability.

<u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts</u>

<u>Thereof From the Federal Republic of Germany; Final Results</u>

of Antidumping Duty Administrative Review, 56 Fed.Reg. 31,692, 31,717 (July 11, 1991).

The plaintiffs complain that MRM presented insufficient evidence to support its claimed adjustment, but the record shows that the ITA was provided with substantial evidence in the form of correspondence between the company and some of its cus-tomers noting the existence of the rebates. See ConfDoc 194; Defendant's Confidential Appendix, Exhibit 9. In addition, the agency was able to verify that the adjustments were tied to the specific transactions at issue. See id.

E

In determining MRM's cost of production, the ITA calcu-lated the company's general-and-administrative ("G&A") expenses for the period of review (February 1993 through July 1994) based upon audited annual financial statements for 1993 and 1994. See 61 Fed.Reg. at 13,829. The plaintiffs contend that

> MRM's inclusion of partial-year data in its reported G&A
> expense ignores the Department's long-standing practice of
> calculating G&A expense "using the annual audited income
> statement for the [one] fiscal year covering the greatest
> part of the [period of review]."

Plaintiffs' Brief, p. 61, citing Ferrosilicon From Brazil; Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg.

59,407, 59,412 (Nov. 22, 1996).  They ask this court to instruct the agency "to recalculate MRM's G&A expense using MRM's 1993 annual audited financial statements only."  <u>Id</u>. at 62.

As noted above, the ITA historically has had latitude in determining cost of production but also has been charged with the duty to make determinations as accurately as possible.  The agency admits that its

> long-standing practice is to calculate G&A expenses from the audited financial statements which most closely correspond to the [period of review].

61 Fed.Reg. at 13,829.  It does this because of "their nature as period costs."  <u>Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From Thailand</u>, 60 Fed.Reg. 22,557, 22,560 (May 8, 1995).  General-and-administrative expenses

> can neither be easily nor accurately matched to the revenues generated from the sales of an individual  unit of production.  Instead, G&A expenses are typ-ically incurred in connection with a company's over- all operations.  Many expenses categorized as G&A,  such as insurance and bonus payments, are incurred sporadically throughout the fiscal year.  Moreover,  G&A expenses are often accrued during the fiscal    year based on estimates that are then adjusted to actual expenses at year-end.

<u>Id</u>.

In each determination cited by the plaintiffs to sup-port their contention that the 1994 data should be excluded, the ITA took such an approach because the data came from unaudited financial statements.  <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at 22,560-61; <u>Certain Cut-to-Length Carbon Steel Plate From Finland: Final Results of An-tidumping Duty Administrative Review</u>, 61 Fed.Reg. 2,792, 2,794 (Jan. 29, 1996);

Final Determination of Sales at Less Than Fair Value: Canned

Pineapple Fruit From Thailand, 60 Fed.Reg. 29,553, 29,565 (June 5,

1995).

Reliance on full-year audited financial statements pro-

vides a more accurate picture of general production costs than

expenses attributed to a shorter period.  Where, as here, however,

the period of review covered substantially more than one year, and

audited annual financial statements for the two years involved were

available, the ITA's decision to rely on both of them to determine

G&A expenses for MRM was within its discretion and is supported by

substantial evidence on the record.

F

The plaintiffs complain that the ITA should not have

allowed an adjustment to foreign-market value for MRM's estimat-ed

credit expenses because the company initially had records of actual

expenses but chose not to preserve them.  See Plaintiffs' Brief, p.

55.  The defendant agrees that this issue should be remanded for

reconsideration because the ITA

> wrongly equated MRM's not retaining actual dates of
> payment in its computer records beyond 90 days with  the
> circumstance where a respondent has no reason to ever
> maintain such data.

Defendant's Memorandum, pp. 46-47.

The company responds that automatic purging of this data from its computer system was in line with its usual business practice, complied with Canadian generally accepted accounting principles, and the ITA "accepted an estimate because it was reasonably accurate."  Response Brief of Gerdau MRM Steel, pp. 10-11.

In NSK Ltd. v. United States, 19 CIT 1013, 1026, 896 F.Supp. 1263, 1274 (1995), aff'd in part, rev'd in part on other grounds, 115 F.3d 965 (Fed.Cir. 1997), the court upheld the ITA's disallowance of home-market credit expense where a respondent's

> computer records did not permit transaction or cus-tomer-specific calculation of credit expenses [and,] consequently, it calculated this expense by allocat- ing total home market credit expenses over each trans-action.

The court stated that "an adjustment to FMV for differences in circumstances of sale is appropriate where the value determination is directly correlated with specific in-scope merchandise  on the basis of actual costs."  19 CIT at 1026-27, 896 F.Supp.  at 1274, citing Smith-Corona Group, Consumer Prods. Div., SCM Corp. v. United States, 713 F.2d 1568, 1580 (Fed.Cir. 1983),  cert. denied, 465 U.S. 1022 (1984).  In Krupp Stahl A.G. v. United States, 17 CIT 450, 822 F.Supp. 789 (1993), the court up-held resort to BIA where original data were unavailable because   the respondent had discarded its

business records after five years in accordance with the rules of its home country.

Here again, the court must emphasize that the most important consideration in cost determination is accuracy of the information submitted. Respondents will not be allowed to manip-ulate margins via reporting to their own convenience, nor will petitioners be allowed to do so by insisting on BIA where another, accurate approach is possible.  If the ITA is able, upon

remand, to make a reasonably accurate estimation of the credit

expenses tied to specific transactions from the data submitted  by

MRM, resort to BIA, which is now called "facts otherwise available"

in the Trade Agreements Act of 1979, as amended by  the Uruguay Round

Agreements Act, Pub. L. No. 103-465, §231(c), 108 Stat. 4809, 4896

(1994), should not occur. If, however, the agency is unable to verify

the accuracy of the data made available, reliance on BIA would be

appropriate.


                              G

        The plaintiffs complain about a ministerial error in

Algoma's model-match program.  Both the defendant and the com-pany

confirm the existence of such an error.  <u>See</u> Defendant's Memorandum,

p. 14; Brief for Algoma Steel Inc., p. 30.


                              II

        In view of the foregoing, plaintiffs' motion for judg-ment

upon the agency record must be granted to the extent of re-mand to

the ITA for reconsideration of (c) their allegation of   a

methodological problem in Stelco, Inc.'s allocation of price

adjustments and (f) the allowance of an adjustment for MRM's credit

expenses, as well as (g) to correct the agreed-upon min- isterial

error in Algoma Steel Inc.'s model-match program.  In  all other respects, the aforesaid motion must be, and it hereby is, denied.

The agency may have 90 days for such reconsideration and to report the results thereof to this court, whereupon the parties may serve and file any comments thereon within 30 days, with replies thereto due 15 days thereafter.

So ordered.

Decided:  New York, New York
          June 2, 2000


                                    _____
                                              Judge