PULTON CHAIN CO., INC., PLAINTIFF v. UNITED STATES, DEFENDANT, AND AMERICAN CHAIN ASSOCIATION, DEFENDANT-INTERVENOR

Court No. 96–12–02877

(Dated December 2, 1997)

*Arent Fox Kintner Plotkin & Kahn (Patrick F. O'Leary* and *Peter L. Sultan)* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Cynthia B. Schultz), Sanjay Mullick,* Attorney-Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for defendant.
*Covington & Burling (David R. Grace)* for defendant-intervenor.

## OPINION

RESTANI, *Judge:* Pulton Chain Co., Inc. challenges the determination of the International Trade Administration of the United States Department of Commerce ("Commerce" or "ITA") in *Roller Chain, Other Than Bicycle, from Japan*, 61 Fed. Reg. 64,328 (Dep't Commerce 1996) (final results of admin. rev.) (hereinafter *"Final Results")*. At issue is ITA's selection of a first-tier best information available ("BIA") rate of 43.29% for this respondent. ITA is joined in its defense of this selection by defendant-intervenor, American Chain Association. The matter is before the court on a motion for judgment on the administrative record pursuant to USCIT R. 56.2.

## FACTS

On May 12, 1994, Commerce initiated an antidumping duty administrative review of six manufacturers/exporters of roller chain. Among these was Pulton. The period of review was April 1, 1993 through March 31, 1994. *Roller Chain, Other Than Bicycle, from Japan*, 61 Fed. Reg. 28,171, 28,171 (Dep't Commerce 1996) (preliminary results of admin. revs.).

On May 26, 1994, Commerce issued a questionnaire to the six companies being reviewed, including Pulton. Commerce's Questionnaire (May 26, 1994), at 1, Pub. Doc. 6, Def.'s App. 1, at 1. In the U.S. sales section of the questionnaire, Commerce asked Pulton to report "[a]ll sales made during the period of review" and *"[a]ll shipments* of subject merchandise entered for consumption into the United States during the period of review." *Id.* at 8, Def.'s App. 1, at 8.

On June 2, 1994, Pulton responded in a certified statement by reporting that "Pulton had no sales and no exports to U.S. customers of merchandise subject to the *Roller Chain, Other Than Bicycle, from Japan* dumping finding" for the 1993–1994 review period. Response to Questionnaire (June 2, 1994), at 1, Pub. Doc. 10, Def.'s App. 2, at 1.

On November 29, 1995, Commerce informed Pulton that "we have recently received information from the U.S. Customs Service (Customs)

indicating that there were entries of roller chain, other than bicycle, manufactured by Pulton during the 93–94 and 94–95 [periods of review]." Letter from Commerce to Pulton Chain (Nov. 29, 1995), at 1, Pub. Doc. 81, Def.'s App. 3, at 1. Commerce requested that Pulton "[p]lease provide explanations of the entries for both PORs no later than the close of business on December 6, 1995." *Id.*

On December 6, 1995, Pulton responded to Commerce's letter dated November 29, 1995. Letter from Pulton Chain to Commerce (Dec. 6, 1995), at 1, Conf. Doc. 18, Def.'s App. 4, at 1. Pulton explained that all but one entry was outside the investigation. *Id.* at 2, Def.'s App. 4, at 2. With respect to that one entry, Pulton stated that it was not discovered because the invoice characterized the product in a way that did not make it apparent to the employee reviewing the invoice that it was responsive to Customs' questionnaire. *Id.*

Pulton further stated in its letter that:

> Pulton is prepared to answer the ITA's questionnaire for the shipment listed on Attachment 2. While the entry date is in the 1994–1995 review period, the shipment date, March 14, 1994, is in the 1993–1994 period. Consequently, *Pulton plans to answer the 1993–1994 questionnaire, unless the ITA instructs differently.* Pulton will discuss with the case analyst a date for submitting this information.

*Id.* (emphasis added). Pulton did not submit a questionnaire response. ITA did not give Pulton permission to file a late response and the record does not reveal that Pulton followed up on its December 6, 1995 letter.

On June 4, 1996, Commerce issued its preliminary results for the 1993–1994 review and assigned Pulton a 43.29% first-tier BIA rate. *Roller Chain, Other Than Bicycle, from Japan*, 61 Fed. Reg. at 28,172. Commerce explained that "Pulton stated that it had inadvertently failed to report one shipment of subject merchandise during the POR." *Id.* Accordingly, Commerce determined that "[b]ecause Pulton failed to report the shipment of subject merchandise in response to the Department's questionnaire, we have treated Pulton as uncooperative and used first-tier BIA * * * to determine its dumping margin for this review." *Id.*

On July 8, 1996, Pulton filed its case brief with Commerce commenting upon the 1993–1994 review. Pulton's Case Br. to Commerce (July 8, 1996), at 1, Pub. Doc. 142, Def.'s App. 5, at 1. Pulton argued that Commerce erred in assigning Pulton a non-cooperative BIA rate:

> Pulton did not decline to cooperate with the Department. Pulton responded to the Department's questionnaire, albeit by informing the Department that it had no sales or exports of subject merchandise to U.S. customers during the period of review. * * * [T]he oversight of the one sale was an honest mistake. As soon as the error was brought to Pulton's attention, *Pulton sought permission to submit a response with regard to this sale*, and it continues to be willing to submit this information.

*Id.* at 3, Def.'s. App. 5, at 3. In addition, Pulton argued that Commerce could not use 43.29% as first-tier BIA because it was punitive and not a finalized rate. *Id.* at 5–7, Def.'s App. 5, at 5–7.

On December 4, 1996, Commerce published its final results of review for the 1993–1994 POR of roller chain. *Final Results,* 61 Fed. Reg. at 64,328. Commerce sustained its decision to apply first-tier BIA to Pulton because Commerce determined that Pulton had significantly impeded the review by not submitting a questionnaire response within 180 days after notice of initiation of the review. *Id.* at 64,331. Commerce stated that to accept a response from Pulton at that juncture would delay the completion of the review. *Id.* Further, Commerce stated that its selection of 43.29% as the first-tier BIA rate was appropriate because the rate had been previously upheld by this court in *Sugiyama Chain Co., Ltd. v. United States,* 18 CIT 423, 436, 852 F. Supp. 1103, 1114 (1994). *Id.* at 64,332.

### DISCUSSION

This action is governed by antidumping law as it existed before the Uruguay Round Agreement Act ("URAA"). The Federal Circuit has definitively addressed pre-URAA BIA law in *D & L Supply Co. v. United States,* 113 F.3d 1220 (Fed. Cir. 1997). *D & L Supply* stands for the proposition that the ITA cannot use a rate for BIA purposes that has been invalidated. *Id.* at 1221. The 43.29% rate was established as a deposit rate in the 1979–1980 administrative review. *See Roller Chain, Other Than Bicycle, from Japan,* 46 Fed. Reg. 44,488, 44,488, 44,490–91 (Dep't Commerce 1981) (final results of admin. rev.). In the final results of that review Commerce stated,

> The Department is currently reviewing the method of adjusting home market prices to reflect different levels of trade for certain firms.
> While the margins shown in this notice for the following companies will remain in effect for the purpose of determining estimated cash deposits, liquidation of entries for these firms will continue to be suspended * * *
> A decision concerning the actual assessment of dumping liabilities, if any, for entries by the above firms with purchase dates or export dates, as appropriate, during the periods indicated in this notice will be addressed in a subsequent notice.

*Id.* at 44,488 (list of 13 companies omitted).

The 43.29% was never used as an assessment rate and apparently was considered likely to be inaccurate when promulgated because of the lack of level of trade adjustment. Its subsequent use as a BIA rate in *Sugiyama,* 852 F. Supp. at 1114, does not make it an acceptable rate under the later established *D & L Supply* standard. While an abandoned rate is not quite the same as a rate invalidated by a court, as was the *D & L Supply* rate, it is very close. *See D&L Supply,* 113 F.3d at 1223–24.

Furthermore, as explained above, the circumstances of the promulgation of the 43.29% rate makes it unusually suspect and even more akin

to the *D & L Supply* situation. In addition, this rate is extremely outdated and no other calculated rate in this investigation has ever come close to this level. *Cf. Manifattura Emmeppi S.p.A v. United States*, 16 CIT 619, 623–24, 799 F. Supp. 110, 114–15 (1992) (10 year old deposit rate not applicable to party unacceptable for BIA purposes). Indeed, for this respondent the rates have been in the 0–6% range. *Pulton Chain Co., Inc. v. United States*, 17 CIT 1136, 1143 (1993); *Roller Chain, Other than Bicycle, from Japan*, 60 Fed. Reg. 62,387, 62,389 (Dep't Commerce 1995) (final results of admin. rev.) (1992–1993 period of review); *Roller Chain, Other Than Bicycle, from Japan*, 58 Fed. Reg. 52,264, 52,266 (Dep't Commerce 1993) (final results of admin. rev.) (1991–1992 period of review). Accordingly, the court concludes that the 43.29% rate may not be used for Pulton because it is essentially an invalid rate and its use would be purely punitive.

The next issue is whether Pulton was properly assigned first-tier BIA status as an uncooperative respondent. Commerce has adopted a two-tiered method for applying BIA. *Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1190 (Fed. Cir. 1993). First-tier BIA is reserved for uncooperative respondents, *i.e.*, respondents which fail to provide information in a timely manner or otherwise significantly impede an administrative review. *Id.* Second-tier BIA is for respondents that cooperate but nonetheless fail to provide information requested by Commerce. *Id.* at 1190–91. Whether first-tier or second-tier BIA applies to a particular respondent "essentially turns on the level of cooperation exhibited by that respondent during the review." *Id.* at 1192.

The administrative determination at hand is particularly unenlightening as to ITA's reasons for finding Pulton uncooperative to a degree justifying application of a severely adverse rate. ITA seems to have assumed that Pulton's mistake was not an honest one.[1] In fact, while close scrutiny of more obscure information in the invoice enables one to determine that the invoice is covered by the investigation, the initial plain words of the invoice easily could mislead someone to conclude that the invoice did not involve covered roller chain. *See* Letter from Pulton Chain to Commerce (Dec. 6, 1995), at attachment 2, Def.'s App. 4, at attachment 2. Nothing in the record supports the conclusion that this was not an honest mistake.

Pulton's next behavior, however, is more confusing. Presumably it knew that it must receive a BIA rate if it submitted no data, yet the record reveals no clear action on its part to obtain permission to file the data out of time. While ITA might reject the information, Pulton surely had no chance to obtain its own calculated rate if it failed to attempt the filing of the data before preliminary results were issued. Pulton did not file an "unsolicited" questionnaire response after December 6, 1995 and before June 4, 1996 (the date of issuance of the *Preliminary Results*) as

---

[1] The court presumes this to be the case because ITA did not notify Pulton after its December 6, 1995 letter that it could file its data. Given Pulton's timely explanation on December 6, one would expect ITA to have allowed a slight extension if it had believed that a simple mistake had occurred.

required by Commerce's regulations. *See* 19 C.F.R. § 353.31(b)(2) (1996) (stating that "normally" unsolicited responses will be rejected but "in no event will the Secretary consider unsolicited questionnaire responses submitted after the date of publication of the Secretary's preliminary determination"); *see also RHP Bearings v. United States*, 875 F. Supp. 854, 856–57 (CIT 1995) (unsolicited information untimely because submitted after publication of preliminary results and 180 days after publication of notice of initiation of administrative review).

In the ordinary case of a choice by ITA of first-tier BIA, the court would expect an explanation of how late filed information would interfere with and impede the timely completion of the investigation and calculation of accurate margins, but here it is obvious that the total lack of data impeded the investigation. Thus, the only question is who had the burden to act after Pulton made known in its December 6, 1995 letter its desire to submit data. Was it ITA's obligation in these circumstances to set a new filing deadline, or to say why it was then too late?[2] Or was it Pulton's obligation to lodge the requested data and request ITA to accept it, or at least to ask expressly for a new filing date, if it did not wish to prepare data which would be rejected?

ITA should address these questions directly. If it properly finds that Pulton failed to meet the burdens thrust upon it by the statute and regulations, it may categorize Pulton as uncooperative and select an appropriate BIA rate (the 43.29% rate may not be used).

Remand results are due within thirty days hereof. Objections are due within eleven days. Responses within five days thereafter.

---

[2] No one has mentioned whether there was a verification schedule established.