SLIP OP. 05-129

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - -x
                               :
SHANDONG HUARONG GENERAL       :
GROUP CORPORATION and          :
LIAONING MACHINERY IMPORT      :
& EXPORT CORPORATION,          :
                               : Before: Richard K. Eaton, Judge
     Plaintiffs,               :
                               : Court No. 01-00858
            v.                 :
                               :
UNITED STATES,                 :
                               :
     Defendant.                :
                               :
                               :
                               :
- - - - - - - - - - - - - - - - x
```

OPINION AND ORDER

[United States Department of Commerce's Final Determination on heavy forged hand tools remanded to Commerce]

Dated: September 27, 2005

*Hume & Associates, PC* (*Robert T. Hume*), for plaintiffs.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*).

Eaton, Judge:  This matter is before the court following a second remand to the United States Department of Commerce ("Commerce").  In *Shandong Huarong General Group Corporation v. United States*, 28 CIT __, slip op. 04-117 (Sept. 13, 2004) ("*Huarong II*"), this court remanded Commerce's determination in the ninth administrative review of heavy forged hand tools from the People's Republic of China ("P.R.C."), covering the period of review February 1, 1999, through January 31, 2000.  *See* Heavy Forged Hand Tools From the P.R.C., 66 Fed. Reg. 48,026 (ITA Sept. 17, 2001) (final determination) ("Final Results").  Plaintiffs Shandong Huarong General Group Corporation ("Huarong") and Liaoning Machinery Import and Export Corporation ("LMC") (collectively the "Companies") challenged that determination with respect to Commerce's decision to apply the P.R.C.-wide antidumping duty margin to their subject merchandise.  The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons set forth below, this matter is again remanded to Commerce with instructions to conduct further proceedings in conformity with this opinion.

BACKGROUND

The relevant facts and procedural history in this case are set forth in *Huarong II*.  A brief summary of these is included

here.  On February 14, 2000, Commerce published a notice of opportunity to request administrative reviews of the Final Results.  *See* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 65 Fed. Reg. 7348 (ITA Feb. 14, 2000) (opportunity to request admin. rev.).  In response, several P.R.C. entities, including the Companies, requested administrative reviews.  *See* Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the P.R.C., 65 Fed. Reg. 66,691, 66,692 (ITA Nov. 7, 2000) (prelim. results and prelim. partial rescission of antidumping duty admin. revs.) ("Prelim. Results").  Commerce then commenced its investigation and distributed standard nonmarket economy ("NME") country[1] antidumping questionnaires.

Based on information provided by the Companies in their original and supplemental questionnaire responses, Commerce determined that they were each preliminarily entitled to company-specific antidumping duty margins separate from the P.R.C.-wide antidumping duty margin.  *See* Prelim. Results, 65 Fed. Reg. at

---

[1]     A "nonmarket economy" country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i).

66,693.  Commerce then calculated Huarong's preliminary company-specific antidumping duty rate for bars/wedges to be 0.44%, and calculated LMC's preliminary company-specific antidumping duty rate for bars/wedges to be 0.01%.  *See id.* at 66,696.  The P.R.C.-wide antidumping duty rate for bars/wedges was calculated to be 47.88%.  *Id.*

Commerce then notified the Companies that it would conduct verification of their submitted sales and factors of production information.  After review and analysis of the questionnaire responses and the information gathered at verification, Commerce determined that it was proper to use facts available[2] and adverse

---

[2]     Use of facts available is warranted where Commerce finds that a respondent has, *inter alia*, withheld or failed to provide requested information.  *See* 19 U.S.C. § 1677e(a).  The statute provides:

> If—
> > (1) necessary information is not available on the record, or
>
> > (2) an interested party or any other person—
>
> > > (A) withholds information that has been requested by the administering authority or the Commission under this subtitle,
> >
> > > (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(continued...)

facts available,[3] as the Companies had withheld information and

_____

[2](...continued)
              (C) significantly impedes a
              proceeding under this subtitle, or

              (D) provides such information but
              the information cannot be verified
              as provided in section 1677m(I) of
              this title,

     the administering authority and the Commission shall,
     subject to section 1677m(d) of this title, use the facts
     otherwise available in reaching the applicable determination
     under this subtitle.

*Id.*

     [3]     The use of adverse facts available is warranted if
Commerce

          finds that an interested party has failed to
          cooperate by not acting to the best of its
          ability to comply with a request for
          information from [Commerce] . . . .
          [Commerce], in reaching the applicable
          determination under this subtitle, may use an
          inference that is adverse to the interests of
          that party in selecting from among the facts
          otherwise available.  Such adverse inference
          may include reliance on information derived
          from—

               (1) the petition,

               (2) a final determination in the
               investigation under this subtitle,

               (3) any previous review under
               section 1675 of this title or
               determination under section 1675b
               of this title, or

               (4) any other information placed on
               the record.

                                              (continued...)

failed to cooperate by not acting to the best of their ability to comply with Commerce's requests for information.[4]  *See* Final Results, 66 Fed. Reg. at 48,028.  As a result of these findings, the Companies were, among other things, found not to have demonstrated their independence from the P.R.C. government, and their subject merchandise was therefore assigned the final P.R.C.-wide antidumping duty rate of 47.88%.  *See id*. at 48,030 n.1.  The Companies then commenced this action for judgment upon the agency record pursuant to USCIT Rule 56.2, arguing that Commerce's decision to apply the P.R.C.-wide antidumping duty margin to their subject merchandise was not supported by substantial evidence or otherwise in accordance with law.  The court ordered a remand, instructing Commerce to reevaluate the evidence submitted by the Companies with respect to their entitlement to separate rates, and to "revisit . . . its determination that the Companies were to receive the PRC-wide

---

[3](...continued)
19 U.S.C. § 1677e(b).

[4]     Specifically, Commerce found that Huarong failed to report the great majority of its U.S. market sales and had prepared almost none of the documents requested of it in Commerce's verification outline.  *See* Final Results, 66 Fed. Reg. at 48,028.  Similarly, Commerce found that LMC had supplied none of the documents requested in the verification outline and could not provide the information necessary to verify its own submissions to Commerce.  *See id*; *see also Shandong Huarong General Group Corp. v. United States,* 27 CIT __, slip op. 03-135 (Oct. 22, 2003) (affirming Commerce's application of facts available and adverse facts available to both Huarong and LMC).

antidumping duty margin." *Shandong Huarong General Group Corp.
v. United States,* 27 CIT \_\_, \_\_, slip op. 03-135 at 45 (Oct. 22,
2003) ("*Huarong I*").  In the Final Results of Redetermination
Pursuant to Court Remand (Jan. 20, 2004), Commerce found that the
Companies were entitled to separate rates, and assigned each
company an antidumping duty rate of 139.31% based on adverse
facts available.  The court affirmed Commerce's determination to
apply separate rates, but remanded Commerce's decision to apply a
rate of 139.31%, on the grounds that the rate was aberrational
and not supported by substantial evidence.  *See Huarong II*, 28
CIT at \_\_, slip op. 04-117 at 17.


### STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding,
or conclusion found . . . to be unsupported by substantial
evidence on the record or otherwise not in accordance with
law . . . ." *Huaiyin Foreign Trade Corp. (30) v. United States*,
322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. §
1516a(b)(1)(B)(I) (2000)).  "Substantial evidence is 'such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" *Id*. at 1374 (quoting *Consol. Edison
Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The existence of
substantial evidence is determined "by considering the record as
a whole, including evidence that supports as well as evidence

that 'fairly detracts from the substantiality of the evidence.'"
*Id.* (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556,
1562 (Fed. Cir. 1984)).


                            DISCUSSION

     Title 19 U.S.C. 1677e(a) permits Commerce to use the facts
otherwise available in making its determination when an
interested party withholds or fails to provide requested
information, significantly impedes Commerce's investigation, or
provides information that cannot be verified.  If Commerce
further determines that a party has failed to cooperate by not
acting to the best of its ability to comply with a request for
information, Commerce may "use an inference that is adverse to
the interests of that party in selecting from among the facts
otherwise available."  19 U.S.C. § 1677e(b).  In drawing the
adverse inference, Commerce may rely on information drawn from
the petition, a final determination in the investigation, any
previous review, or any other information placed on the record.
*Id.*


I.   The 139.31% Antidumping Duty Rate

     In *Huarong II*, the court found that the rate Commerce
selected was aberrational and not indicative of what the
Companies' actual rate would likely have been had they cooperated

with Commerce's investigation, "with some built-in increase intended as a deterrent to non-compliance." *Huarong II*, 28 CIT at __, slip op. 04-117 at 17. The court based its finding on two factors: (1) Commerce failed to demonstrate that assigning to the Companies the rate of another producer[5] in the eighth administrative review satisfied the requirement that Congress "intended for an adverse facts available rate to be a reasonably accurate estimate of the [Companies'] actual rate, albeit with some built-in increase intended as a deterrent to non-compliance"; and (2) even if the rate assigned to the Companies in the ninth administrative review could reasonably have been higher than the rate they received in the preceding review, Commerce gave no explanation as to why the rate would have increased so dramatically, i.e., by over 100 percentage points. *See id.* at __, slip op. 04-117 at 16–17. The court therefore instructed Commerce to "revisit the evidence cited for its decision to apply the 139.31% rate and, shall it continue to employ such rate, provide adequate explanations for this decision based on the evidence." *Id.* at __, slip op. 04-117 at 17.

In the Remand Results, Commerce continues to apply the 139.31% rate, claiming that it "is representative of the margins

---

[5]     The other producer, Tianjin Machinery Import & Export Corp. ("TMC"), produced the same bars/wedges covered by the antidumping duty order at issue here.

that we would have calculated for Huarong and LMC in the ninth

review had they not received total [adverse facts available],

with an increase to encourage cooperation." Remand Results at 1.

First, Commerce maintains that the rate chosen bears a rational

relationship to commercial practices in the Companies' particular

industry, despite representing a five-fold increase in their

margins from the eighth to the ninth review and being 91.43

percentage points greater than the P.R.C.-wide rate:

> The Court has upheld [Commerce's] chosen AFA [adverse
> facts available] rates when the rates sought to be
> imposed are "relevant, and not outdated, or lacking a
> rational relationship." *See Ferro Union, Inc. v.
> United States*, 23 CIT 178, 205, 44 F. Supp. 2d 1310,
> 1335 (1999) . . . . Further, the rate chosen must
> have some relationship to commercial practices in the
> particular industry. *See Ta Chen Stainless Steel Pipe,
> Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir.
> 2002) . . . . [Commerce] selected as AFA a rate
> calculated for another PRC company, TMC, in the
> immediately preceding review. This rate therefore
> reflects recent commercial activity by Chinese
> exporters. These facts alone establish that this rate
> has some relationship to commercial practices in the
> industry – indeed recent commercial practices – and are
> a strong indication of the relevance of this
> information.

*Id*. at 4 (internal citation omitted). Thus, although Commerce

claims that the 139.31% rate represents the rate it would have

calculated for the Companies plus an additional percentage to

encourage cooperation, it seeks to justify the rate as having

some relationship to the Companies' industry — rather than the

Companies themselves.

As an initial matter, the cases relied upon by Commerce do not support its findings. For instance, *Ferro Union* is incompletely quoted. Commerce states that "[t]he Court has upheld [Commerce's] chosen AFA rates when the rates sought to be imposed are 'relevant, and not outdated, or lacking a rational relationship.'" Remand Results at 4 (quoting *Ferro Union*, 23 CIT at 205, 44 F. Supp. 2d at 1335). In fact, the passage from *Ferro Union* reads, "In order to comply with the statute and the [Statement of Administrative Action's] statement that corroborated information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to Saha Thai [the Plaintiff]." *Ferro Union*, 23 CIT at 205, 44 F. Supp. 2d at 1335. By not quoting the case fully, Commerce apparently wishes to leave the impression that *Ferro Union* stands for the proposition that it need only justify its chosen rate as bearing a rational relationship to the particular industry under investigation. A reading of the relevant sentence in its entirety, however, makes clear that each assigned adverse facts available rate must bear a rational relationship to the individual company itself. In like manner, the holding in *Ta Chen* requires that an assigned rate relate to the company to which it is assigned. "Because Commerce selected a dumping margin within the range of Ta Chen's actual sales data, we cannot conclude that Commerce 'overreached

reality.'" *Ta Chen*, 298 F. 3d at 1340.  Thus, while *Ta Chen* does

note that sales practices within an industry may provide support

for concluding that a rate is accurate, Commerce's goal is to

assign a rate that accurately reflects what a company's rate

would have been had it cooperated.  It is to that rate that

Commerce is then permitted to add an amount to deter non-

compliance.  Here, there is no indication that Commerce has

sought to select a rate that bears a rational relationship to the

Companies themselves.


Second, in *Huarong II* the court expressed its concern that

"even if the rate calculated for the Companies in the ninth

administrative review may have been higher than the rate they

received in the preceding review, Commerce has given no

explanation as to why the rates would likely have increased so

dramatically, i.e., by over 100 percentage points." *Huarong II*,

28 CIT at __, slip op. 04-117 at 16.  In the Remand Results,

Commerce

> notes that margins in the bars/wedges order have varied
> widely from year to year and company to company.  For
> example, Fujian Machinery & Equipment Import & Export
> Corporation ("FMEC") jumped from 1.05 percent in the
> 1994-1995 review to 36.76 percent in the 1995-1996
> review, Huarong increased from 1.27 percent in the
> 1997-1998 review to 27.28 percent in the 1998-1999
> review, LMC grew from zero percent in the 1997-1998
> review to 27.18 percent in the 1998-1999 review, and
> TMC dropped from 139.31 percent in the 1998-1999 review
> to 0.56 percent in the 1999-2000 review.  When looking
> at the rates for different companies within a

particular review period, we found that rates ranged from 2.94 percent to 38.30 percent in the 1996-1997 review and from zero percent to 47.88 percent in the 1997-1998 review.  As these examples clearly illustrate, margins in the bars/wedges order have experienced greater than 25-fold increases from review to review, and more than 19-fold differences between companies in a particular review period.

Remand Results at 4-5 (footnote omitted).  In other words, Commerce maintains that the five-fold increase in the Companies' margins is consistent with the volatile nature of calculated rates for bars and wedges. *Id*. at 5.  While changes in antidumping duty rates from one review to the next may be consistent with the "volatile nature" of the rates for bars/wedges, Commerce has still failed to demonstrate the validity of such a large absolute increase.  For example, Huarong's rate in the eighth review was calculated to be 28.96%.  Following remand in the ninth review, Huarong's rate jumped over 110 percentage points, to 139.31%.  It is worth noting that in the tenth review, Huarong's rate was calculated to be 16.22%.  Similarly, LMC's rate in the eighth review was 29.10%.  Following remand in the ninth review, LMC's rate jumped by nearly the same amount as Huarong's, over 110 percentage points, also to 139.31%.  In the tenth review, LMC's rate was 0.00%.  By contrast, in the examples Commerce provided, it found that "rates ranged from 2.94 percent to 38.30 percent in the 1996-1997 review and from zero percent to 47.88 percent in the 1997-1998 review."  Remand Results at 4.  In no case do the increases from one review to the

next approach the 110 percentage point increase experienced by
Huarong and LMC from the eighth to the ninth review.
Significantly, Commerce's sole justification for a five-fold
percentage increase — volatility — is never tied to the Companies
themselves.  That is, Commerce provides no explanation as to why
the Companies' rates should increase so dramatically in this
case.

Third, Commerce states that, because there was no
corroborating data available in the ninth review for purposes of
calculating the Companies' antidumping duty margins, it was
entitled to justify its chosen rate by referencing calculated
transaction-specific margins from the eighth review for Huarong
and LMC.  Commerce explains:

> Given that Huarong, LMC, and SMC [Shandong Machinery
> Import & Export Corp., another respondent in the ninth
> review] failed to cooperate and thus received total AFA
> [adverse facts available], and FMEC [Fujian Machinery
> Import & Export Corp., another respondent in the ninth
> review] remained within the PRC-wide entity (which also
> received total AFA), the only respondent left from the
> ninth review that could possibly serve as a basis of
> corroborating the rate selected as AFA is TMC.  In the
> ninth review, TMC received a calculated, weighted-
> average margin of 0.56 percent for bars/wedges, which
> is nearly a *de minimis* margin under 19 C.F.R. §
> 351.106(c)(1).  TMC's information does not provide a
> suitable basis[6] for corroborating the selected rate,
> nor do we consider this one cooperative respondent to

---

[6]     Commerce gives no explanation as to why TMC's ninth
review rate was not suitable; apparently, while reliable, the
rate was simply too low for Commerce's purposes.

represent the behavior of uncooperative respondents. Remand Results at 5.

With respect to the transaction-specific margins it calculated for the Companies from the eighth review, Commerce gives the following explanation: "Several of these transaction-specific margins for both Huarong and LMC are well above 47.88 percent, which is the second highest margin ever calculated for bars/wedges.  In fact, a significant number of the transaction-specific margins are nearly as high as the 139.31 percent rate selected as AFA [adverse facts available]." *Id*.  This explanation overstates the case.  Of eighty-seven transaction-specific margins, the highest was calculated at 120.53%, and thirteen others ranged from 97.84% to 117.20%.  The remaining seventy-three margins were all calculated at 0.00%.  Nonetheless, Commerce insists that because several of Huarong's and LMC's transaction-specific margins are nearly as high as the adverse facts available rate selected,

> [t]he U.S. transactions corroborating the AFA [adverse
> facts available] rate do not appear to be aberrant or
> unusual in any way. . . .  Because we are making an
> adverse inference with regard to Huarong and LMC, we
> regard these transactions as representative of the
> margins we would have calculated for these companies in
> the ninth review (with a built-in incentive to
> encourage cooperation) had they not received total AFA
> . . . .  Because these transaction-specific margins for
> Huarong and LMC in the eighth review are nearly as high as
> the rate selected as AFA, and these margins were calculated
> for transactions involving the same class of merchandise
> sold in the same market, under similar demand and supply

conditions, as the AFA rate, we find that they support the
relevance of the rate selected as AFA.

*Id*. at 6.


In their joint brief, the Companies first argue that
"Commerce's reliance on certain of Plaintiffs' sales from the
eighth review is misplaced.  Commerce highlights only selected
sales made by Plaintiffs in the eighth review.  These selected
sales, by themselves, do no corroborate the 139.31 [percent] rate
as applied to <u>all</u> Huarong and LMC sales in the ninth review."
Pls.' Comments on Final Results of Redetermination Pursuant to
Court Remand ("Pls.' Comments") at 11 (emphasis in original).
The Companies explain:

> By using selected sales to corroborate the 139.31[%]
> rate, Commerce failed to note that they also calculated
> total weighted dumping margins for Plaintiffs in the
> [eighth] review.  Since the 139[.31%] rate [of TMC]
> represents a total weighted dumping margin, it would
> follow that the weighted dumping margins in the eighth
> review are the best values for comparison, not the
> transaction-specific margins cited by Commerce.

*Id*. at 11-12.  Put another way, the Companies urge an apples-to-
apples comparison: Since TMC's 139.31% rate is a weighted-average
margin from the eighth review, for corroboration purposes it
should be compared to the weighted-average margins for the
Companies from that same review, i.e., 28.96% for Huarong and
29.10% for LMC, not selected transaction-specific margins from
the eighth review.

The court finds that Commerce's reliance on the Companies' high-margin transactions as corroboration for the 139.31% rate does not satisfy its mandate to determine antidumping duty margins as accurately as possible.  Of the eighty-seven transaction-specific margins, only one was calculated at 120.53%, the closest percentage to the Companies' rate of 139.31%.  Just thirteen transactions, or 14.9%, ranged from 97.84% to 117.20%. The vast majority of all transactions, i.e., over 83% of the transactions, were calculated at 0.00%.  Moreover, at no point does Commerce provide an adequate explanation as to why these transaction-specific margins are probative of the validity of the use of a weighted-average margin from an unrelated company.  In order for Commerce to carry out its mandate to determine antidumping duty margins as accurately as possible, where the information is available a "like-kind" comparison is preferred. In other words, if Commerce wished to use the Companies' sales to corroborate the use of the 139.31% weighted-average margin for TMC in the eighth review to the Companies, then the preferred method would be to use the Companies' own weighted-average margins for that same review.  Here, the court finds that the chosen transaction-specific rates do not provide a sufficiently probative like-kind comparison to TMC's weighted-average margin to satisfy the substantial evidence requirement, nor do these aberrational sales reasonably corroborate the 139.31% weighted-

average rate.[7]  *See World Finer Foods, Inc. v. United States*, 24

CIT 541, 547-48 (2000) (not reported in the Federal Supplement)

(refusing to uphold Commerce's use of "apparently aberrant

transactions" from unrelated respondents to corroborate

petitioners' margin, where Commerce did not explain whether the

transactions represented a significant portion of the

transactions at issue or how the transactions related to a

rational dumping margin for petitioners).

Next, Commerce insists that if either Huarong or LMC could

have demonstrated that its dumping margin was lower than "the

highest cash deposit rates for bars/wedges," they would have

provided evidence showing their margins to be less.  Remand

Results at 6.  Relying on *Rhone Poulenc, Inc. v. United States*,

899 F.2d 1185, 1190-91 (Fed. Cir. 1990), Commerce explains:

Since the highest cash deposit rates[8] for bars/wedges

---

[7]     The court finds the facts of this case to be
distinguishable from those in *Branco Peres Citrus, S.A. v. United
States*, 25 CIT 1179, 173 F. Supp. 2d 1363 (2001).  In that case,
Commerce used Plaintiff's single highest transaction-specific
margin because the application of a weighted-average dumping
margin would have allowed Plaintiff to benefit from its non-
cooperation.  The court acknowledged, however, that "the
selection of a party's highest transaction-specific rate may not
in every case be reasonable . . . ."  *Id*. at 1191, 173 F. Supp.
2d at 1377.

[8]     Importers who enter merchandise that is within the
scope of an antidumping duty order must make a deposit of
estimated antidumping duties.  19 U.S.C. § 1673d(c)(1)(B)(ii)
                                                    (continued...)

> being collected by U.S. Customs and Border
> Protection("CBP") during the period of the ninth review
> . . . were . . . 47.88 percent, and [Commerce] assumes
> that a respondent will cooperate if its actual margin
> is less than such rate, it is reasonable to conclude
> that the actual margins for Huarong and LMC in the
> ninth review were greater than 47.88 percent.

Remand Results at 6 (footnotes omitted).  Commerce cites to no

source demonstrating that this assumption follows its past

practice or that it has been found to be in accordance with law

by any Court.  Nor does this court find justification for this

assumption in Commerce's reliance on *Rhone Poulenc*.  The Court in

*Rhone Poulenc* found that, in cases where use of adverse facts

available[9] is justified, it is reasonable to assume that "the

[company's] highest prior margin is the most probative evidence

of current margins because, if it were not so, the importer,

knowing of the rule, would have produced current information

showing the margin to be less."  *Rhone Poulenc,* 899 F.2d at 1190

(emphasis omitted).  Here, the highest prior margins for reviews

in which the Companies cooperated are Huarong's rate of 34.00% in

the sixth review and LMC's rate of 29.10% in the eighth review.

---

[8](...continued)
(requiring the posting of a cash deposit, bond, or other security
in the final antidumping determination Commerce makes in the
investigation).

[9]     It should be noted that the analysis in *Rhone Poulenc*,
a 1990 case, was governed by the application of the best
information available ("BIA") rule, which was used prior to
enactment of the Uruguay Round Agreement Act ("URAA") in 1995.
The URAA replaced Commerce's application of BIA in antidumping
duty cases with the use of facts available.

The most that can be assumed from the Companies' failure to cooperate is that they believed their rates in the ninth review would exceed their rates in these prior reviews.

Finally, nowhere does Commerce explain why it failed to follow the court's instruction in *Huarong II* to "explain its reasons for not choosing a previous antidumping duty rate for the Companies themselves." *Huarong II*, 28 CIT at __, slip op. 04-117 at 17.

Based on the foregoing, it is apparent that Commerce has failed to justify the 139.31% rate with substantial evidence. Indeed, Commerce's strained efforts to demonstrate the validity of this elevated rate lead the court to find that the application of the rate is punitive in nature. *See F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("[T]he purpose of [the statute governing adverse inferences] is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."). In choosing a margin, Commerce must "appropriately balanc[e] th[e] goal of accuracy against the risk of creating a punitive margin." *Timken Co. v. United States*, 26 CIT 1072, 1076, 240 F. Supp. 2d 1228, 1234 (2002). "Punitive rates are the result of rejection of low-margin information in

favor of high-margin information that is demonstrably less probative of current conditions." *Usinas Siderurgicas de Minas Gerais, S.A. v. United States*, 22 CIT 743, 765 n.41 (1998)(not reported in the Federal Supplement)(citing *Rhone Poulenc*, 899 F.2d at 1190); *see also Peer Bearing Co. v. United States*, 25 CIT 1199, 1206, 182 F. Supp. 2d 1285, 1296 (2001) (citing *Allied-Signal Aerospace Co. v. United States*, 996 F. 2d 1185, 1191 (Fed. Cir. 1993)).  Here, the record shows that Commerce had several other sources from which to choose the Companies' rates, which would have been more probative of the Companies' actual rates, and to which a further percentage could be applied to ensure compliance.  For example, Commerce could have chosen from among the Companies' rates for previous reviews.  In addition, other sources available to Commerce are the petition rate, the rate from a final determination or previous review, and any other information on the record that would indicate what the Companies' rate might have been had they cooperated.  *See* 19 U.S.C. § 1677e(b).

CONCLUSION

Because the court finds that Commerce has failed to justify the 139.31% rate assigned to the Companies, and further finds that the rate is punitive, Commerce is directed upon remand to no longer employ this rate.  Also upon remand, Commerce is directed

to choose and justify its choice of one of the following rates:

    (1)    the Companies' rates from a previous review, with a built-in increase as a deterrent to non-compliance; or

    (2)    a calculated rate that accurately reflects what the Companies' rates would have been had they cooperated, with a built-in increase as a deterrent to non-compliance.

Remand results are due on December 27, 2005, comments are due on January 26, 2006, and replies to such comments are due on February 6, 2006.

                                  /s/Richard K. Eaton
                                  Richard K. Eaton

Dated:    September 27, 2005
            New York, New York